Ramzi Abadou (SBN 222567)
**LAW OFFICE OF RAMZI ABADOU**
79 Woodland Ave.
San Francisco, California 94117
Telephone: (415) 231-4313
rabadou@gmail.com

*Counsel for Michael Moore and*
*the Putative Class*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

MICHAEL MOORE, individually and
on behalf of a class of all others
similarly situated,

               Plaintiff,

     v.

THE CITY AND COUNTY OF SAN
FRANCISCO, THE SAN FRANCISCO
POLICE DEPARTMENT and PAUL
YEP, in his official capacity as the San
Francisco Police Department Interim
Chief of Police,

               Defendants.

Case No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**CLASS ACTION**

**JURY TRIAL DEMANDED**

*"Big Brother is watching you.*"[1]

## I.    PRELIMINARY STATEMENT

1.    Plaintiff Michael Moore alleges the following based upon personal knowledge with respect to himself and, with respect to all other matters, the investigation of Counsel.

2.    Counsel's investigation included a review and analysis of, *inter alia*: (i) regulatory filings and policies issued and disseminated by the City and County of San Francisco (the "City") and the San Francisco Police Department ("SFPD") (together with Defendant Paul Yep, "Defendants"); (ii) press releases, media statements and marketing presentations issued and disseminated by Defendants; and (iii) industry reports concerning automated license plate readers ("ALPRs"). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

3.    Plaintiff asserts claims under: (i) California Senate Bill 34 ("S.B. 34"), which prohibits the sharing of ALPR information with out-of-state law enforcement agencies, Civ. Code § 1798.90.5 *et seq.*; and (ii) the Fourth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983, alleging that Defendants deprived him and all similarly situated class members of their privacy rights.[2]

### Summary of Allegations

4.    Defendants have now installed and monitor a network of over 450 Flock ALPR cameras ("Flock Cameras") throughout San Francisco that make it functionally impossible to drive anywhere in the City without having one's movements tracked, photographed, and stored in an AI-assisted database that enables the warrantless surveillance of one's movements. While former Mayor Breed lauded this development as a tool to combat shoplifting, local news simultaneously reported that "[p]rivacy advocates worry the cameras will be abused by officers, invading the privacy of San

---

[1]    George Orwell, "*1984*"

[2]    The Honorable Chief District Court Judge Mark S. Davis denied defendants' motion to dismiss under facts virtually identical to those pled here. *See Schmidt et. al v. City of Norfolk et al.*, Civil Action No. 2:24cv621 (E.D. Va. Feb. 5, 2025).

Franciscans or surveilling the general public."[3]   In 2023, even the California Attorney General "remind[ed] agencies of their obligation to ensure that the storage, collection, sharing, and use of this [ALPR] information is consistent with California law[,]" including S.B. 34.[4]   Privacy advocates – including the Electronic Frontier Foundation ("EFF") – and California AG Bonta had every right to worry.

5.    This civil rights Action seeks to curtail Defendants' unconstitutional ALPR surveillance program.   Plaintiff's allegation that Defendants disregarded the California Attorney General's directives regarding the surveillance challenged in this lawsuit occurred at the very same time the President of the United States is seeking to use such surveillance to locate and intimidate his perceived political opponents – including those with the temerity to hold what Trump views "anti-American[], anti-capitalis[t], and anti-Christian[]" beliefs.[5]   Against this backdrop, on December 26, 2025, *Politico* reported that "[f]ederal records show that ICE has increased its spending on surveillance technology, looking to spend more than $300 million under Trump for social-media monitoring tools, facial recognition software, ***license plate readers*** and services to find where people live and work."[6]

6.    ALPR technology is a powerful surveillance tool that is used to invade the privacy of individuals and violate the rights of entire communities.   ALPR systems collect and store location information about drivers whose vehicles pass through ALPR cameras' fields of view, which, along with the date and time of capture, can be organized by a database that develops a driver profile

---

[3]    https://www.ktvu.com/news/400-license-plate-cameras-coming-to-san-francisco-privacy-advocates-concerned

[4]    https://oag.ca.gov/news/press-releases/attorney-general-bonta-advises-california-law-enforcement-legal-uses-and

[5]    https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence/

[6]    https://www.politico.com/news/2025/12/26/ice-high-tech-surveillance-lower-privacy-guardrails-00705401

revealing sensitive details about where individuals work, live, associate, worship, protest and travel.[7]

7.     On March 20, 2024, the SFPD announced that, "[s]tarting on March 19, 2024, Flock Safety ("Flock") began installing ALPR cameras in various strategic locations across San Francisco. This rollout is expected to take place over the next 90 days."[8]  The only monitoring policy disclosed in the SFPD's announcement reads, "[p]rior to being granted access to the Flock Safety portal, members will be required to complete training. A training video will be uploaded to Power DMS. Members will be notified when training becomes available. After completing the required training and being onboarded, the member will receive a welcome to Flock email which will provide access to the platform."[9]

8.     The same March 20, 2024 SFPD announcement also provided a link to the SFPD's 2019 "Surveillance Technology Policy" which states in relevant part that "ALPR data collected by SFPD *is not used for the enforcement of Immigration Laws*."[10]  Defendants' assurance was false.  It has since been disclosed that Defendants shared Flock ALPR information with, *inter alia*, the States of Texas and Georgia and Immigration Customs Enforcement ("ICE"). Defendants thereby violated not only S.B. 34, but the Fourth Amendment and the SFPD's *own ALPR policies*.[11]

9.     A September 8, 2025 investigative report by *The San Francisco Standard* titled "SFPD let Georgia, Texas cops illegally search city surveillance data on behalf of ICE" revealed that the SFPD has now publicly *admitted* that: "[a]ccording to a recent audit of our network, it appears agencies outside California had the ability to query SFPD's Flock system for a [purported] limited period of

---

[7]     https://sls.eff.org/technologies/automated-license-plate-readers-alprs

[8]     https://www.sanfranciscopolice.org/your-sfpd/policies/department-bulletins-notices/24-052

[9]     *Id*.

[10]     *Id*.  All emphasis added unless otherwise noted.

[11]     *Id*.

1    time."[12]  Then, during a September 10, 2025, San Francisco Police Commission hearing, however,

2    former interim SFPD Chief Paul Yep admitted that the SFPD was investigating audit findings showing

3    queries of its Flock automated license-plate reader network from agencies *outside California*.

4         10.    Defendants have contracted with Flock to blanket San Francisco with approximately

5    494 advanced Flock Cameras, which photograph *every* car that passes them.  Defendants' surveillance

6    dragnet establishes a detailed record of where every driver in San Francisco has travelled and, any

7    person or entity with access to the Flock database can discover routes which any vehicle has travelled

8    across San Francisco 24 hours a day and 365 days a year.  This level of surveillance not only enables

9    those granted access to Flock with a detailed map of the driver's travel patterns, but also their personal

10   associations.

11        11.    Flock provides advanced search and artificial intelligence functions that SFPD officers

12   can use to output a list of locations a car has been captured, create lists of cars that have visited specific

13   locations, and even track cars that are seen together.

14        12.    There are no meaningful restrictions on Defendants' access to this information.  SFPD

15   officers need only watch Flock's orientation video and create login credentials to gain access. SFPD

16   officers can then log in and use Flock's database throughout their entire shift. Although officers are

17   required to use the information only for law enforcement purposes, no one proactively monitors their

18   use. Defendants' ALPR system therefore constitutes warrantless and unreasonable surveillance.

19        13.    This is so because the SFPD's Flock-enabled surveillance is conducted without a

20   warrant, and SFPD officers do not have to establish probable cause, swear to the facts in a warrant

21   application, and await the approval of a magistrate judge before accessing the Flock database.

22   Defendants' Flock Cameras take photographs and store the information of every single civilian driver

23   that passes them — suspect or not. The photographs and information are then available to any Flock-

24   trained SFPD officer to use.  And if Defendants download the photos and information, there are no

25

26   [12]    Tomoki Chien, SFPD let Georgia, Texas cops illegally search city surveillance data on behalf

27   of    ICE,    THE    SAN    FRANCISCO    STANDARD    (September    8,    2025)
     https://sfstandard.com/2025/09/08/sfpd-flock-alpr-ice-data-sharing/.

28

4

meaningful restraints on how long they can access them or how they may be used.

14.     Flock also maintains a centralized nationwide database with over one **billion** license plate reads **every month**. So, even after a driver leaves San Francisco, state and federal authorities can potentially keep tracking them in the more than 5,000 communities where Flock currently operates its cameras. Likewise, any person or entity with access to Flock's centralized database can access the SFPD's information, potentially, even without the SFPD's knowledge.

15.     Plaintiff is a retired public-school teacher, homeowner and U.S. citizen who lives and drives in San Francisco. Nearly every day, he travels past Defendants' Flock Cameras as he drives to the store, his sons' schools or to meet friends and family.  Plaintiff tries to maintain a reasonable amount of privacy and is troubled that the City's Flock Cameras track him almost everywhere he goes, storing his movements in a government database for any officer or third-party to potentially exploit.

16.     These concerns are particularly acute under the Trump Administration – now well-known for exploiting national surveillance to quash political dissent.[13] Indeed, in an article titled "*California Cities Double Down on License-Plate Readers as Federal Surveillance Grows*," KQED reported on December 18, 2025 that, "despite a series of media reports demonstrating local AI-enabled ALPR databases are feeding a federal surveillance system used by the Trump administration against immigrants and others … **most California officials appear to be digging their heels in**."[14]

17.     Accordingly, as alleged throughout herein, Defendants' camera surveillance system violates Plaintiff's Fourth Amendment privacy rights. Tracking the whole of a person's public movements over (at least) 30 days is a search.[15]  Defendants are gathering information about everyone

---

[13]     https://www.usatoday.com/story/news/politics/2025/06/04/trump-surveillance-state-federal-data/83924420007/

[14]     https://www.kqed.org/news/12066989/california-cities-double-down-on-license-plate-readers-as-federal-surveillance-grows

[15]     The SFPD's purported Flock transparency portal states that its retention period is far beyond 30 days at 365 days.  *See* https://transparency.flocksafety.com/san-francisco-ca-pd.

who drives past any of its approximately 494 cameras to purportedly facilitate investigating crimes.[16] In doing so, Defendants are violating the longstanding societal expectation that people's movements and associations over an extended period are private. And because Defendants have engaged in this surveillance without a warrant—instead letting individual SFPD officers decide for themselves when and how to access an unprecedented catalogue of every person's movements throughout San Francisco and beyond—its searches are unreasonable.

18.    This is exactly the type of police surveillance the Fourth Amendment was adopted to prevent. For instance, at least 19 searches run by external states and agencies were marked as related to U.S. Immigration and Customs Enforcement ("ICE"),[17] such that Defendants unlawfully exposed sensitive driver location information to the federal government and U.S. states that lack California's rigorous privacy protections.[18] By unlawfully sharing such location information, Defendants are enabling out-of-state and federal agencies to track, locate, and potentially prosecute California residents and visitors, including for purposes expressly prohibited by the U.S. Constitution and California law.

19.    To prevent these violations—and the harm caused by exposing driver information to out-of-state agencies—Plaintiff seeks herein to remedy the unlawfulness of such surveillance. This civil rights class action lawsuit is designed to rectify Defendants' brazen efforts and/or failures to responsibly deploy and employ Flock's Orwellian ALPR technology against Plaintiff and the putative class.

_____

[16]    https://transparency.flocksafety.com/san-francisco-ca-pd.

[17]    Tomoki Chien, SFPD let Georgia, Texas cops illegally search city surveillance data on behalf of ICE, THE SAN FRANCISCO STANDARD (September 8, 2025) https://sfstandard.com/2025/09/08/sfpd-flock-alpr-ice-data-sharing/.

[18]    Article I, Section 1 of the California Constitution provides that "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy*." (emphasis added). This provision creates a right to privacy more protective than the implicit privacy protections in the United States Constitution. (*In re Carmen M.*, 141 Cal.App.4th 478, 490 n. 10 (2006)).

6

1

## II.    JURISDICTION AND VENUE

2       20.    This is a civil-rights action brought under the Fourth Amendment to the U.S.

3    Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28

4    U.S.C. § 2201.  This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) as this action seeks

5    redress for the violation of Plaintiff's constitutional and civil rights.

6       21.    This action is also brought pursuant to S.B. 34, Civ. Code § 1798.90.5 *et seq*. which

7    provides a private right of action for violations of S.B. 34. This Court possesses supplemental

8    jurisdiction over Plaintiff's S.B. 34 claim under 28 U.S.C. §1367.

9       22.    Venue is proper under 28 U.S.C. § 1391 (a) and (b). As described below, Plaintiff and

10   Defendants reside in this district, and the events giving rise to Plaintiff's claims occurred in this district

11   and division.

12   ## III.    PARTIES

13       ### A.    Plaintiff

14       23.    Plaintiff Michael Moore is a longtime adult resident of San Francisco and a retired

15   public-school teacher.  Plaintiff has a valid California driver's license and drives throughout the City

16   on a regular basis.

17       24.    Defendant the City and County of San Francisco ("the City") is a municipal entity

18   created under the laws of California.  At all relevant times hereto, the City was responsible for the

19   policies, practices and supervision of the City's Flock Cameras.

20       25.    Defendant SFPD is the police department for San Francisco. The SFPD is responsible

21   for the administration and management of Defendants' contract with Flock and San Francisco's ALPR

22   systems and Flock Cameras.

23       26.    Defendant Paul Yep is sued in his official capacity as the SFPD's former interim Chief

24   of Police. In that capacity, Defendant Yep was head of the SFPD and was responsible for its

25   administration, with immediate direction and control of the SFPD and its Flock Cameras.

26

27

28

1    IV.    SUBSTANTIVE ALLEGATIONS

2         **ALPR Technology**

3         27.    ALPRs are computer-controlled AI-enabled cameras mounted above ground level or

4    on police cars (and now drones) that automatically capture all license plate numbers that come into

5    their view. These images are then transferred to a computer or server, which uses optical character

6    recognition software to convert the image into a license plate number.

7         28.    ALPR is a relatively new technology and, as the technology has improved and become

8    less expensive, it has gained more widespread adoption among law enforcement agencies.  ALPRs

9    operate around the clock and capture images of every car that passes their field of view within a  fixed

10   distance, including at high speeds or at night.  Once an ALPR captures a license plate, it creates a

11   record of the location and time of capture which is then stored in an AI database—perhaps indefinitely.

12        29.    Companies that sell ALPRs and related software services to police departments and

13   federal immigration agencies also offer their customers the capability to pool data. By opting-in to

14   such data sharing—or neglecting to opt out—police departments create ***multijurisdictional*** databases

15   tracking the movements of cars across virtually the entire country.  Police departments commonly

16   compare the license plate images to "hot lists" which typically include vehicles reported stolen and

17   those suspected of involvement in a crime.  This is all done under the guise of fighting crime.  Rather

18   than address SFPD's 500 police officer shortfall to combat crime, however, Defendants created a high-

19   tech surveillance hub called the Real-Time Investigation Center at 315 Montgomery St. in the City

20   which houses its ALPR surveillance dragnet.

21        30.    In just 2019 alone, however, of the over 1 billion license plate scans collected by just

22   82 agencies nationwide, ***99.9% of this surveillance data was not actively related to any criminal***

23   ***investigation when it was collected***. Still, law enforcement agencies are stockpiling this data, often

24   for years.[19]

25

26   _____

27   [19]    https://www.eff.org/deeplinks/2021/04/data-driven-2-california-dragnet-new-dataset-shows-
     scale-vehicle-surveillance.

28                                                      8

31.    Anyone with access to a police department's ALPR database can use the data to track any vehicle over time. With enough cameras, the data can be used to pinpoint a car's location and map its movements over any time period for which data exists. A driver can be tracked to a doctor's office, a peaceful political protest or almost anywhere else – all without a warrant.

32.    ALPRs also create a record of every other car that was at those locations at the same time, revealing not just where the person driving travelled but also any persons in proximity to the driver at the same time. The data can then be analyzed to discern with whom a driver met or traveled, revealing the driver's community, colleagues and political and other associations.

33.    Flock offers software that automates the tracking process, allowing an officer to easily compile these records with minimal effort. A warranted investigation that would have required a team of officers to tail someone for days or a team of investigators to cobble together information from multiple data sources now only takes an instant in this context. Software programs like Flock's enable the SFPD and federal authorities to map a driver's route and can even produce an analysis of vehicles commonly seen in the same vicinity.

34.    Absent any warrant requirement, how authorities use these systems is left to their own discretion. Unmonitored officers can abuse their access to get information for illegitimate reasons—like tracking protestors or personal acquaintances. And third parties can gain access for nefarious and unlawful purposes.  These threats are more than just theoretical.

35.    For instance, multiple police officers (including a police chief) in Kansas used ALPR data from the same vendor (Flock) used by Defendants to stalk their own former girlfriends.[20]  U.S. Customs and Border Protection's ALPR vendor was hacked and license plate images of thousands of travelers at border crossings were made available on the dark web.[21]  The U.S. Cybersecurity and Infrastructure Security Agency issued an alert after discovering a "low attack complexity"

---

[20]    https://www.kansas.com/news/politics-government/article291059560.html.

[21]    https://www.washingtonpost.com/technology/2019/10/10/surveillance-contractor-that-violated-rules-by-copying-traveler-images-license-plates-can-continue-work-with-cbp/.

1    vulnerability in ALPRs sold by Motorola Solutions.[22]

2          36.    Defendants' sharing of ALPR information with out-of-state entities for the purpose of

3    assisting with immigration enforcement also violates S.B. 54, also called the California Values Act or

4    California's "sanctuary" law, which places restrictions on the use of California state or local resources

5    to assist with federal immigration enforcement. Attorney General Bonta has issued a helpful

6    Information Bulletin clarifying that S.B. 54 "[p]rohibits use of [California law enforcement agency]

7    resources to investigate, interrogate, detain, detect, or arrest persons for immigration purposes…"

8          **Flock Safety**

9          37.    Within the past few years, a number of companies have started to offer enhanced

10   ALPRs and software to police departments across the country.  Among the largest is Flock, a tech

11   start-up founded in 2017. Flock's Cameras are located in over 5,000 communities throughout the

12   United States.

13         38.    Flock offers several different ALPR cameras to both government and private-sector

14   customers. Its cameras are compact and require little to no infrastructure, making them easy to install

15   and operate. Its Falcon LR cameras, purchased and currently used by Defendants in San Francisco, for

16   instance, can operate around the clock, power themselves with solar energy, and capture vehicles

17   traveling up to 100 miles per hour from up to 150 feet away.

18         39.    When Flock Cameras capture an image of a car, Flock's software uses machine

19   learning to create what Flock calls a "Vehicle Fingerprint." The "fingerprint" includes the color and

20   make and model of the car and any distinctive features, like an anti-Trump bumper sticker or roof

21   rack. Flock's software converts each of those details into text and stores them in an organized database.

22   Flock users can then easily filter their searches based on those features because the "Vehicle

23   Fingerprint" automatically links different images of the same car within Flock's database, creating a

24   record of that car's movements over time.

25         40.    Flock offers other software features for police departments to use in conjunction with

26   _____

27   [22]    https://www.cisa.gov/news-events/ics-advisories/icsa-24-165-19.

28                                          10

1    its cameras. These features: (i) create real-time alerts against hotlists; (ii) analyze patterns of
2    movement; (iii) flag repeat visitors to the area; (iv) provide a streamlined advanced search; (v) project
3    information onto maps; (vi) analyze vehicles frequently seen in proximity to one another; and (vii)
4    generate lists of vehicles that have visited multiple locations of interest like a "No Kings Protest."
5    Flock advertises these features as "a force multiplier" for police departments that can significantly
6    streamline and expedite investigations and tracking.[23]

7         41.    Flock also enables its customers (like Defendants) to pool their data into a centralized
8    database that provides police departments access to over 1 billion monthly datapoints across Flock's
9    more than 5,000 customers. Flock thus gives police departments the ability to track drivers not just
10   within their own jurisdiction, but potentially across the entire nation.  A woman from Texas seeking
11   reproductive care in San Francisco could easily, for instance, be tracked on her drive to and from Texas
12   by Flock technology and then arrested upon her return to Texas where abortions have been
13   criminalized.

14        42.    In March 2024, then-Mayor London Breed announced the city was installing 400 Flock
15   Safety Falcon cameras.[24]   On September 8, 2025, *The San Francisco Standard* published an
16   investigative report titled "SFPD Let Georgia, Texas cops illegally search city surveillance data on
17   behalf of ICE: Out-of- State authorities made 1.6 million searches of San Francisco's license-plate
18   reader data – likely in violation of California law."  The investigative report revealed, *inter alia*, that:

19
20   - San Francisco police let out-of-state cops run more than ***1.6 million illegal searches of the city's license-plate reader database*** — including at least 19 that were marked as related to U.S. Immigration and Customs Enforcement;

21
22   - The controversial surveillance technology, produced by Atlanta-based Flock Safety, captures the license plate and description of every passing vehicle, then stores the information for use in police investigations. In San Francisco, where 400 Flock Cameras line major roadways, ***it's nearly impossible to escape the camera readers' eye***.
23
24

25   _____

26   [23]    https://www.flocksafety.com/why-flock.

27   [24]    https://www.flocksafety.com/blog/sf-takes-historic-step-to-solve-crime-with-400-lpr-cameras

28

- [R]eporting by *The Standard*, *404 Media* … and others has revealed that police nationwide are illegally handling license-plate data and ***giving ICE backdoor access to their Flock networks***, renewing long-held concerns about abuse of the technology.

- [N]ewly unearthed logs show that the questionable sharing of data was far more widespread than previously understood: The SFPD gave out-of-state agencies direct access to the City's data between at least August 2024 and February 2025, ***enabling a far higher volume of illegal searches than was known before***.

43.    *The San Fransico Standard's* review of the entry logs demonstrated that "[e]ach entry includes the agency that initiated the search, the reason for the search, the time of submission, and the number of Flock networks the agency searched for a given license plate. Police departments often simultaneously search thousands of Flock networks across multiple states and municipalities in a given query. ***The SFPD redacted the reasons for searches in its public records disclosure***."[25]

44.    *The Standard*, however, was able to determine the reasons:

[B]y cross-referencing agency names and timestamps with more than 35 million unredacted Flock searches published on the website Muckrock (opens in new tab), The Standard filled in many of the blanks. For instance, the SFPD's logs show that on Dec. 26 at 7:16 p.m, the Franklin County Sheriff's Office in Georgia made a search of San Francisco's data that was later redacted.

But logs from the Danville Police Department in Illinois — another of the 5,757 law enforcement agencies queried in the same search — are unredacted. The reason supplied: "ICE FUGOPS," an apparent reference to the agency's Fugitive Operations program, whose goal(opens in new tab) is to "locate, arrest and remove fugitive aliens from the United States."

The logs show the SFPD's data was searched at least 19 times for "ICE Fugitive," "Assist ICE," or specific ICE detention numbers. The majority of those searches were made between Oct. 23 and Dec. 27, 2024, by the Franklin County Sheriff in Georgia, the Dallas Police Department, and the Milford Police Department in Massachusetts.

ICE has a criminal investigations wing that's less known than its deportation operation, so a search for "ICE case" isn't necessarily related to immigration. City contracting documents show the SFPD agreed to pay Flock more than $3.9 million for access to its technology between Feb. 20, 2024, and Feb. 19,

---

[25]    *See* n. 12, *supra*.

2027.[26]

45.    The data the Flock Cameras collect belong to the SFPD but Flock retains data on a rolling 30-day basis.  Nothing, however, prevents the SFPD or its officers from downloading and saving the data for longer than the SFPD's 365-day retention period.[27]  And Defendants have empowered Flock to store data for longer time periods to comply with what Flock perceives to be its legal obligations.

46.    The SFPD does not require officers to establish probable cause or obtain a warrant to access the Flock data. And, in practice, officers commonly do access the data without probable cause or a warrant.  Upon information and belief, Flock Cameras capture the start of nearly every trip Plaintiff makes in his car, so he effectively cannot drive in the City without the SFPD either surveilling him.

47.    Upon information and belief, Plaintiff routinely drives past some of the many Flock Cameras posted at undisclosed locations throughout San Francisco. Images of Plaintiff's car and the associated data about his movements are stored in a database accessible to any SFPD officer, as well as anyone else the SFPD has either knowingly or unwittingly granted access. Flock users can leverage this information to follow Plaintiff's movements throughout San Francisco, and even throughout other jurisdictions that let Flock pool their data.  SFPD officers can map nearly all of Plaintiff's movements for at least the past 30 days.

48.    Flock's "Convoy Analysis" feature also lets users identify vehicles that are often seen together so that anyone with access to Flock's record of Plaintiff's movements can use it to see who he meets, when, and where. They can thereby assess who Plaintiff's closest friends are and with whom he associates.  Plaintiff does not expect government officials to record his movements and subsequently be permitted to track and analyze his patterns and affiliations for over 30 days without

---

[26]    *Id*.

[27]    https://transparency.flocksafety.com/san-francisco-ca-pd

once being identified as the target of a criminal investigation.

49.    According to industry analysts for *404 Media*, "[d]ata from a license plate-scanning tool that is primarily marketed as a surveillance solution for small towns to combat crimes like car jackings or finding missing people *is being used by ICE* …"[28] Local police around the country are performing lookups in Flock's AI-powered ALPR system for "immigration" related searches and as part of other ICE investigations, giving federal law enforcement *side-door access*.  Indeed, 404 Media has reported that Customs Boader Patrol has "access to more than 80,000 Flock AI Cameras *nationwide*."[29]

50.    The massive trove of data obtained and shared with *404 Media* shows more than 4,000 nation and statewide lookups by local and state police done either at the behest of the federal government, as an "informal" favor to federal law enforcement, or with a potential immigration focus, according to statements from police departments and sheriff offices. While Flock does not have a contract with ICE, the agency sources data from Flock's cameras by making requests to local law enforcement or other private surveillance providers.[30]

## INJURY TO PLAINTIFF AND THE CLASS

51.    Defendants' installation and operation of Flock Cameras and platform in San Francisco create a running record of the whole of Plaintiff's and the class's movements throughout San Francisco and other jurisdictions enabling Flock and Defendants to intentionally or unkowingly share his data with out-of-state agencies.

52.    On March 20, 2024, the SFPD announced that "[s]tarting on March 19, 2024, Flock

---

[28]    https://www.404media.co/ice-taps-into-nationwide-ai-enabled-camera-network-data-shows/

[29]    https://www.404media.co/cbp-had-access-to-more-than-80-000-flock-ai-cameras-nationwide/

[30]    The data reviewed by *404 Media* was obtained using a public records request from the Danville, Illinois Police Department, and shows the Flock search logs from police departments around the country.  *See* ICE Taps into Nationwide AI-Enabled Camera Network, Data Shows, May 27, 2025 (Joseph Cox).

14

Safety began installing ALPR cameras in various strategic locations across San Francisco. This rollout is expected to take place over the next 90 days."[31] Because of Defendants' installation and operation of the Flock Cameras, Defendants have photographed Plaintiff's car virtually every time he has driven in the City after the first 100 Flock Cameras were installed in San Francisco on or around June 12, 2024.[32]

53.    After the Flock Cameras photograph Plaintiff's' car, the Flock database creates a "Vehicle Fingerprint" that links different images of Plaintiff's car and thereby creates a detailed record of Plaintiff's movements in and around San Francisco.  Every image the Flock Cameras capture of Plaintiff's cars is stored in Flock's database for at least 30 days.  A record of the whole of Plaintiff's movements over at least the past 30 days is accessible to any SFPD officer and anyone else the SFPD has granted access for no less than 365 days.

54.    The SFPD has a policy or custom of: (i) not requiring probable cause or individual suspicion for access to Flock data; and (ii) allowing that same access without a warrant. Thus, any SFPD officer can access the whole of Plaintiff's or any other San Francisco driver's movements over at least the past 30 days without a warrant or probable cause.

55.    Plaintiff, like most people, tries to maintain a degree of privacy. The installation and operation of the Flock Cameras and platform throughout San Francisco, however, has given him deep consternation. Plaintiff values his privacy and personal security, and is concerned about how the SFPD, an individual officer, or another Flock user might use or misuse the records of his movements. He is also reasonably concerned that malicious, third-party hackers might one day gain access to Flock's database to, for instance, intimidate him for his political views. Defendants' capture, analysis, and sharing of this data therefore violates his Constitutional privacy rights.

56.    Plaintiff has no control over how Defendants, Flock, or anyone else with access to

---

[31]    https://www.sanfranciscopolice.org/your-sfpd/policies/department-bulletins-notices/24-052

[32]    https://www.sf.gov/news--san-franciscos-new-public-safety-camera-technology-delivering-early-results

Defendant's Flock platform uses the record of their movements. Plaintiff lacks any say about when, or even if, those records will be deleted – besides filing this action. And if Plaintiff's information was to be misused or a data breach was to occur, he may never know - unless the SFPD or Flock was compelled to disclose that information.

57. In essence, Defendants have captured the whole of Plaintiff's vehicular movements since at least June 2024 when the first 100 Flock Cameras were installed in San Francisco and will continue to do so unless enjoined. Defendants therefore have unfettered access to Flock data and will continue to have such access unless enjoined.

## V.    CLAIMS FOR RELIEF

### COUNT I
### *Violation of Plaintiff's Fourth Amendment Rights*
### (42 U.S.C. §1983 and the
### Declaratory Judgment Act)

58. 255. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

59. The Fourth Amendment to the U.S. Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."

60. The Fourth Amendment requires a warrant as a precondition to a search, unless an exception applies.

61. The Fourth Amendment applies to state and local governments through the Fourteenth Amendment's Due Process Clause.

62. Defendants' operation of the Flock Cameras is a search.

63. Defendants' installation and operation of the Flock Cameras is purposeful investigative conduct. Defendants use the Flock Cameras to investigate crimes and gather evidence about criminal conduct.

64. Defendants' installation and operation of the Flock Cameras also violates a subjective expectation of privacy that society recognizes as reasonable.

65. Plaintiff has a subjective expectation of privacy in the whole of his long-term physical

movements. His expectation is that, as a practical matter, neither an ordinary person nor Defendants could create a long-term record of his movements throughout San Francisco and other Flock jurisdictions.

66.    Society's expectation is that law enforcement officers could and would not monitor and catalogue the whole of a person's movements without a warrant for over 30 days.  Likewise, society does not expect state and federal authorities to be able to reconstruct the entirety of a person's movements retrospectively, even without knowing in advance that they want to follow a particular person. As such, Plaintiff's expectation of privacy in the whole of his physical movements is one that society is prepared to recognize as reasonable.

67.    Defendants' surveillance policies are official municipal policies, adopted under color of state law, that violate Plaintiff's rights.

68.    Defendants have a policy or custom of providing SFPD officers with access to Flock's database.

69.    Defendants have a policy or custom of enabling SFPD officers to log into and use Flock's database for the entirety of their shifts.

70.    Defendants have a policy or custom of not seeking or requiring a warrant, probable cause, or any level of individualized suspicion to operate the Flock Cameras.

71.    Defendants have a policy or custom of not requiring a warrant, probable cause, or any level of individualized suspicion to access, use, or search Flock's database.

72.    Defendants have a policy or custom of not seeking or requiring a warrant, probable cause, or any level of individualized suspicion to download and store the photographs and other information that the Flock Cameras collect.

73.    Defendants have a policy or custom of not requiring a warrant, probable cause, or any level of individualized suspicion to access, use, or search information downloaded from Flock's database.

74.    Defendants have a policy or custom of giving each SFPD officer discretion over whether and how to access and use the information available in, or downloaded from, Flock's database.

75.     No exception to the Fourth Amendment's warrant requirement justifies the dragnet surveillance of the whole of Plaintiff's and other drivers' movements as alleged herein.

**COUNT II**
***Violations of S.B. 34***
**(Civ. Code § 1798.90.5 et seq,)**

76.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

77.     Under the California Civil Code, as amended by Senate Bill No. 34, "[a] public agency shall not sell, share, or transfer ALPR information, except to another public agency, and only as otherwise permitted by law." Civ. Code § 1798.90.55(b). A "public agency" is defined as "the state, any city, county, or city and county, or any agency or political subdivision of the state." *See* Civ. Code § 1798.90.5(f).

78.     The Civil Code prohibits Defendants from sharing or transferring ALPR information with out-of-state agencies. Accordingly, California Attorney General's Office has therefore instructed California agencies that "SB 34 does not permit California [law enforcement agencies] to share ALPR information with private entities or out-of-state or federal agencies…."[33] This prohibition applies to all sharing of ALPR information, regardless of the purpose.

79.     By reason of the foregoing, Defendants are liable to Plaintiff and putative class members under S.B. 34.

## VI.    CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on his behalf and others similarly situated who were harmed by the conduct asserted herein. Defendants are excluded from the Class.

81.     The Class is defined as all San Francisco residents with valid California driver's

---

[33]     California Automated License Plate Reader Data Guidance: Information Bulletin, CALIFORNIA DEPARTMENT OF JUSTICE (Oct. 27, 2023) https://oag.ca.gov/system/files/media/2023-dle-06.pdf.

18

licenses who drive in the City and do not opt out from this Action.

82. The members of the class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

83. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the class that predominate over questions that may affect individual class members include whether: (a) Defendants violated S.B. 34, Civ. Code §1798.90.5 *et seq.*; and (b) the Fourth Amendment to the United States Constitution.

84. Plaintiff's claims are typical of those of the putative class because they each were similarly harmed by Defendants' warrantless surveillance of their vehicular movements.

85. Plaintiff will adequately protect the interests of the class and has retained counsel who is experienced in federal class action litigation. Plaintiff has no interests that conflict with those of the Class.

86. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulties in the management of this action that would preclude its maintenance as a class action.

**VII.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B. Declaring that Defendants' policies and customs described in this Action are unlawful and violate the Fourth Amendment (incorporated through the Fourteenth Amendment) to the U.S. Constitution and S.B. 34;

C. Enjoining Defendants from operating their Flock Cameras;

D. Ordering Defendants to delete all images, records, and other data generated by the Flock Cameras;

E. Enjoining Defendants and their officers, employees, agents, and any others acting on

their behalf from using Flock Cameras to collect images or information without first obtaining a warrant based on probable cause;

F.     Enjoining Defendants and their officers, employees, agents, and any others acting on their behalf from accessing any images, records, or other data generated by Flock Cameras without first obtaining a warrant based on probable cause;

G.     Awarding Plaintiff's counsel reasonable attorneys' fees and litigation costs, including but not limited to fees, costs, and disbursements pursuant to 42 U.S.C. § 1988; and

H.     Ordering all other relief to which Plaintiff and the class are entitled, regardless of whether such relief is demanded in this Complaint.

## VIII.     JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury in this action for all issues so triable.

Respectfully submitted,

Dated: December 28, 2025          Law Office of Ramzi Abadou

By:___*/s/ Ramzi Abadou*_____
Ramzi Abadou (SBN 222567)
79 Woodland Ave.
San Francisco, California 94117
Telephone: (415) 231-4313
rabadou@gmail.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on **December 28, 2025**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and I hereby certify that I will mail the foregoing document or paper via the United States Postal Service to the named Defendants on the Manual Service list.

<u>*s/ Ramzi Abadou*</u>
RAMZI ABADOU

<u>**U.S. MAIL/MANUAL SERVICE LIST**</u>

Defendants:
(i) City and County of San Francisco;
(ii) San Francisco Police Department;
and (iii) Paul Yep

City Hall, Room 234

1 Dr. Carlton B. Goodlett Pl.

San Francisco, CA 94102

21